We'll call that case now, Todd Wessinger v. Darrel Vannoy. We'll hear first from Mr. Dale Lee and then Rebecca Hucksmith. Good morning, Your Honors. Thank you for the opportunity to come today. I want to introduce co-counsel who came with me today. Mr. John Singfield is the attorney that tried this case. He's been with the case all along. Kurt Wall helped out in federal court whenever we had our federal hearing before Judge Brady. They came along today to kind of give me moral support and help me out. I did want to point out that Mr. and Mrs. Wayne Gazzardo intended to be here today. They are the parents of one of the victims in this case, but because of the inclement weather and the danger of flooding at their house in Denham Springs, they weren't able to make it today, but they really wanted to be here. They've kept up with the case ever since its inception and call me on a regular basis, wanting to know what's going on with the case. Today, Your Honors, we're here as the appellant. I represent the district attorney's office in the state of Louisiana in this habeas case. We have represented, prosecuted Mr. Wessinger and convicted him of murder, got the death penalty in this case, and ultimately the death penalty got reversed by Judge Brady and the federal district court on a habeas claim. I just want to remind the court that the reason we're here is because of the actions of Todd Wessinger. He walked into a Calendars restaurant, shot and killed his former manager. You can listen to the tape. I put the 9-1-1 transcript in my brief, but you can listen to the tape, and I'll tell you it's a life-changing thing to listen to. We know that. Ma'am? We know the facts. Okay, good. You're not the jury. No, but I think it's important to keep the facts in mind because Judge Brady found, essentially, that the case should be reversed because of the ineffectiveness of his post-conviction counsel and the ineffectiveness of his trial counsel, and I'm here to maintain that, no, he was found guilty and sentenced to death because of his own actions. So I think the facts are important, but I take Your Honor's point. We're really here on the primary issue that arose in federal court. But I did want to remind the court of the facts. We're here on the sentence only. Yes, sir. Yes, sir. What happened in the federal district court, basically, we had a federal habeas application that was filed, I believe, in about 2004. It raised all the claims that had been raised in the state post-conviction action. I know in some of your cases you refer to it as a state habeas action. In Louisiana, we call them post-conviction. So if I call it post-conviction, please understand I'm referring to a state habeas action, I think, which is what most of your cases call it. Anyway, following that, the petition was amended at some point, and then it was amended again in 2010, nearly six years after the initial federal petition was filed. It was amended another time. Judge Brady issued, and Judge Brady has been pretty harsh on us with our death penalty cases in the middle district, but Judge Brady initially issued a 77-page opinion affirming this case. He analyzed particularly the ineffectiveness at the penalty phase claim and found that there was no ineffectiveness proven, and I think his words were something to the effect of what post-conviction counsel and what habeas counsel wanted was to basically paint a different picture of Todd Wessinger's life than had been painted at trial. So he found that it wasn't anything new, it wasn't ineffectiveness, it was just they should have done this instead of doing that. And that was essentially what his ruling was. Within a couple of weeks of that ruling, Martinez came out, Martinez v. Ryan, a U.S. Supreme Court case, and Martinez created a limited exception to get around the Coleman doctrine of basically saying that cases that are procedurally barred in the state court can't be brought in federal court. So Martinez established an exception to that Coleman rule, and basically what it allows is to make an allegation that your post-conviction counsel or your initial review counsel was ineffective in not bringing a claim and it is that ineffectiveness that caused the claim not to be raised. And if you can use that as cause and prejudice, then you might get your claim heard in federal court in the first instance. Now, we have maintained all along that the ruling that Judge Brady ultimately made on the Martinez question and his final ruling following the Martinez hearing is there was no new claim here. The claim that was raised in 2010 was the same claim that was first asserted in 2004 in federal court and in state post-conviction. What Judge Brady referred to, though, when he said he was going to allow a hearing, and I've got this in my brief also, he kept saying he was going to allow the hearing to allow additional evidentiary support for that claim. So additional evidence, not an additional claim. Then there's a big distinction there because if it's merely additional evidence of a claim that has already been brought, this Court has quite clearly said that is not a Martinez claim. I think most recently this Court said that in Villanueva v. Stevens. You essentially had the same type of allegation made to where basically somebody made the allegation in state court and for whatever reason didn't prove up that claim. Then they come to federal court and they say, hey, we want to prove up the claim we couldn't prove in state court. And that's essentially what you had here. The hearing that we had under Martinez was an attempt to prove up the claim that was made in state court and that was initially made in the federal habeas. Now, if you look at our answers and if you look at what Judge Brady did in his initial review, he handled the case as it should be. And we've cited repeatedly to Cohen v. Penholster. It's a U.S. Supreme Court case that basically says when the federal court is reviewing a habeas corpus claim, that you're limited to the record that was before the state court, meaning everything should be brought up in state court first, litigated in state court, and then the federal court is essentially reviewing that to find if there's constitutional error or not. Well, it would be unfair and it would violate the laws of comity and all that other to allow new evidence in federal court. That's what Cullen said. So the state has argued repeatedly that every attempt and every reference that was made and all of the petitions that were filed in federal district court, that any evidence that you're referring to that was not in the state court record is new evidence that must be excluded by Cullen. And we've made that argument throughout this proceeding, and that's what we're saying here. And essentially that's what Villanueva said, and I believe that's also what Matthews v. Davis. Is that a Fifth Circuit case? I can't remember. As I recall, there was not really much evidence introduced in the state court. Right. And I think the federal courts look at what the claim is, not what the evidence is, because if you look at Cullen, if you look at cases like Harrington v. Richter, Shiro, all of those cases, I think most all, if not all of them, came out of the Ninth Circuit and they were all summary dismissals. And what the law is on that is as long as the state court rules on the merits, then this court is reviewing whether or not that merits-based decision was an unreasonable application of federal law. So whether evidence was presented or not, the federal courts are limited by what the state court record is. If it's a summary dismissal, you're limited by that summary dismissal, and you review that summary dismissal. But you don't automatically allow new evidence in federal court to overcome the lack of evidentiary support that's presented in the state court record. So there may not have been much evidence because the trial judge dismissed it summarily. The other argument is that the defense counsel was so pathetic in the state court, he didn't have anything at all but accept the general conclusory pleadings about the— Right, and from the— —about the penalty. And there's no evidence about the character, background, childhood of this particular person, which the Supreme Court said is something that should be looked at in deciding a life or death sentence. Right, and you're referring to trial counsel or post-conviction counsel? I guess I'm referring to the state trial counsel. Okay, well, in Judge Brady's initial ruling, he basically found that the initial trial counsel put on 17 witnesses, and we've made a list of who all they were, including a psychologist and a psychiatrist, a commutation expert, friends and family, including a former chief justice's wife that testified on his behalf. So there was a mitigation case that was presented here, and that mitigation case in Judge Brady's initial ruling he found to be quite extensive. And he said that he thought it was quite a well-done mitigation case and that basically they were arguing in favor of, you know, a different picture, saying, well, you tried that defense and it lost. And he mentioned that it looked like they gambled on approving essentially that Todd Wessinger was generally a good guy, but he became a different guy when he was drinking. So they bet on this alcohol defense and saying that when he becomes drunk or, you know, has this extended drinking that he suddenly becomes a violent, different person. Part of the claim was failure to investigate properly. That was part of the claim in state court, wasn't it? Again, for post-conviction counsel or for trial counsel? Post-conviction counsel. No, in post-conviction proceedings, the argument was that trial counsel failed to adequately investigate. Yes, ma'am. And that had trial counsel adequately investigated, he would have uncovered a lot more evidence.  I believe that claim was made about post-conviction. You can't knowingly forego evidence that you don't know about. So it seems to me you've got to persuade us perhaps that the evidence is, although it's in more detail, it's still along the same lines of what was presented in the trial court. In other words, it seems to me when you've got a failure to investigate claim that you need to, as best you can, tell us what evidence there was in the trial court record that is similar to the, quote, new evidence that the proper, and I'll use that in quotes, investigation showed. Right. Well, again, what occurred at the trial court was, as noted by Judge Brady and as noted in our brief and in other places, I believe it was noted in the Supreme Court opinion, at the penalty phase the defense put on 17 witnesses. Let me try to restate my question. One of the claims was failure to adequately investigate. Right. It would be one thing if trial counsel had investigated all of this childhood history, the knocks to the head, the low, all of the things that now you say should have been turned up. You can't, if he knew about it and consciously chose not to put it on, it's one thing. But he can't consciously choose a trial strategy if he doesn't know about this other evidence. So how do you address that argument? Well, again, we didn't have the testimony of either of the trial attorneys in this case. We had some affidavits, but, of course, we weren't able to cross-examine on those affidavits. We never had a hearing in state court on the claims that were made in state court. So when we come to federal court and the new allegations are made about the failure to investigate, it's hard to say what was investigated and what wasn't because we don't have the testimony of the trial attorney. What was the failure to investigate claim made in the state habeas proceeding? I believe that claim was made, but, again, I don't know exactly what specific evidence they were saying wasn't revealed. If it's related to what was presented in the federal court, basically you had some of the same witnesses that testified in the state court trial testified in federal court, some of the same family members. The only, you know, significant different testimony would have been Dr. Wood's testimony to where he said that he thought maybe there had been some childhood stroke or that maybe there was some brain development problems or whatever that came up. But what happened in state court, and I believe if you look at Mr. Gieselson's testimony, who was the state court post-conviction attorney, he said he made the allegations in state court and he tried to get funding and more time to investigate those, but that the state district judge ruled against him. So it wasn't developed in state court because the state court trial court ruled against him on the merits of the funding and the time that he wanted. Judge Brady didn't focus on that. Right, I know, and that's part of the problem because that points to, even if we get to Martinez, even if we say that this is a procedural default because this claim wasn't raised in state court and it is a procedural default, then we can get to Martinez, and Martinez says you can look at the defaulted claim on federal habeas. Even if you get there, you have to prove that state post-conviction counsel was ineffective. Well, if state post-conviction counsel raised the issue to the trial judge and the trial judge says I'm not giving you any more money to investigate that and I'm not giving you any more time to investigate that, then that is a trial court ruling that you're complaining about now, not the ineffectiveness of the attorney. The attorney raised the issue, he brought it to the attention of the state trial court judge, and the state trial court judge says I'm not giving you any funding and I'm not giving you any more time. So how is that attorney error? That's not attorney error. If it's an error at all, it's error on the state court. That error wasn't appealed. And that error was not appealed. No, no, I mean they took risks to the Supreme Court, but not on that particular issue. Yes, ma'am, not on the funding or the discovery and, you know, you should have allowed me more time to investigate. Basically the Supreme Court essentially ruled on the summary dismissal by the district court judge. Did Judge Brady make additional or different findings regarding ineffectiveness of state habeas counsel? He did when we had the Martinez. And that was another interesting thing is in most of the cases dealing with Martinez, I think this is the only case where we've ever actually had a Martinez hearing, and Judge Brady decided that he was going to hold the Martinez hearing and also have the hearing on the ineffectiveness of trial counsel at the same time. Could you address the findings that Judge Brady did make regarding ineffectiveness of state habeas counsel? Okay, well, the first finding that he made, which we think is an error, is that this was a procedurally barred claim in the first place. Basically throughout the proceedings, Judge Brady referred to this as additional evidentiary support of the claim that was made in 2004. Suddenly, whenever Martinez came out, he— I want you to focus on the findings Judge Brady made about state habeas counsel. Basically, I think he said something to the effect of that he hadn't been trained, that he was trying to educate himself in the process, that he didn't have a lot of time to prepare, and basically that he didn't bring this particular claim. Again, in this particular claim, dealing with the Dr. Woods testimony or whatever, really, even at the hearing, Mr. Gieselson said, hey, all I needed was more time and more money and the courts wouldn't give me that. So basically, because he did not have the time and money, he found that he was ineffective. What was his name? How do you pronounce it? Soren, S-O-R-E-N, and I always mispronounce his name. I think it's Gieselson, G-I-S-L-E-S-O-N, I believe that's how it's spelled. I always call him Gieselson. I think it's actually Gieselson. Sorry if I mispronounced it. So the claims were asserted, he just didn't have access to pay experts. Yes, ma'am. Yes, ma'am. And essentially, ma'am. The claims were raised. Yes, ma'am. I believe the claims were raised. Essentially that there should have been more investigation, there should have been more penalty phase evidence, that we should have looked for low intellectual functioning, I think was one of the things that was alleged in the state court, and that's what Judge Brady said, I'll allow you to explore that. And I think under federal rules, they were given some money, they hired some people, and those people were the people that ultimately testified in the court. And I just wanted to mention, I think part of the problem that we have here, though, also, is Judge Brady in his initial ruling saying that he wanted to have a Martinez hearing, said that this is all based on the 2010 amended petition. And he said that amended petition, he said he aired whenever he initially dismissed that under Cullen v. Penholster, he said what I should have found was that this was a precluded claim, and now that it's a precluded claim, I can, you know, conduct a Martinez inquiry. Well, if he allows an amended petition in 2010, then we assert that that was way beyond the one-year federal statutory limits that were available in cases such as Mayell v. Felix and cases along that nature. So, you know, that although Rule 15 allows some expansion and allows possible amendments, it certainly doesn't change the 2244 one-year time limitation. So we would assert that if this is all based on a 2010 amended petition, then that petition cannot relate back to the 2004 petition, so it must be untimely. And under Mayell v. Felix, it can only relate back if it does not fundamentally alter the claim. If it fundamentally alters the claim and makes it a new claim, then the amendment is too late. If it doesn't fundamentally alter the evidence and become a new claim, then we don't have a Martinez hearing because they're just seeking to introduce additional evidence in violation of Cullen. Because it was the same claim. It was the same claim, but that's what the State has maintained all along. You know, and by that, again, if you look at Villanueva and some of the other cases that discuss it, I'm sorry. I'm sorry. Go ahead. Under those cases, new evidence to support a claim that you didn't prove in State court is barred by Cullen. How did Judge Brady explain this as being a different claim? I don't think he explained it very well at all. He basically said, I should have found that the new additional evidence, that it changed it enough that it should have been treated as a procedurally barred claim. Well, it's not a procedurally barred claim. It is evidence that should be excluded under Cullen. It's not a new claim. It's an altered evidence. It's new evidence, not a new claim is what we have tried to argue. That's how I characterize it. Well, we have cases that say we do recognize a new claim. Yes, ma'am. And so to the extent you can say, assuming you lose on other arguments and we get to that question, what's your best argument that this is not, in fact, a new claim under our cases that recognize there can be a new claim? If the new evidence that was asserted in Federal court for the first time so fundamentally alters the original postconviction claim and the original claim that was in the 2004 habeas petition, if it alters it to that extent that it is a new claim, then I say that it's time barred under Mayo. Well, let's say you lose on that. Then I want you to get at, which is what's, tell us why it's not a new claim factually. Why it's not a new claim federally because essentially. Factually. Factually. Because essentially it's, all of the evidence is there intended to bolster the original claim. So if the evidence is being admitted to bolster the original claim, or as Judge Brady calls it, the additional evidentiary support of the initial claim. Well, I said sometimes it can get you over a hurdle, whatever that hurdle is. It's so different it fundamentally alters the claim. Now, can you address for us factually why we should not match it up and say it doesn't get there because. Okay. If it's a new claim and if it beats the one-year time bar and if it's a cause and exception under Martinez so that we have the Federal hearing that we had and the evidence is introduced, then you still have to analyze the evidence. And then Judge Brady basically said that he could conduct a de novo hearing because it's a new claim. And essentially he chose to ignore all of the previous evidence that was admitted at trial and otherwise. All of the evidence that he had previously said was not ineffective. So if you look at all that new evidence in the light of this claim, what did we find at this hearing? We had some additional witnesses from the family that said he had a poor family upbringing, his father had a bad upbringing, his father may have abused him when he was a child, and that he may have had strokes when he was a child and that the left and right side of his brain may not communicate well. Well, all of those things added together, I think the court has to weigh all of that in light of the evidence that was presented at trial and in light of what the jury saw, and that's why I referred to the facts initially whenever I stepped up here, because the jury that was weighing this had to look at it in light of everything else. This jury had no problem convicting and giving Todd Wessinger the death penalty. Now, if you would have put before them and said, oh, did you know that he might have had a stroke when he was a kid and maybe he's now using his left hand instead of his right hand, I don't think that would have had a whole lot of effect. Now, if that would have been something that says he can't operate at a particular level or he's retarded or something like that, it might have risen to that level. But here even the person that testified in federal court said no, he's not retarded, he's got a 90-91 IQ, he's otherwise functioning well, and he seems to have overcome whatever these difficulties was that he faced in his younger years and that these many strokes or whatever may or may not have caused him to wear a brace when he was younger, but he overcome all of that. And when you're sitting there on the jury and you hear this lady being shot and killed and bleeding out on that 911 tape, you realize that Todd Wessinger didn't kill her because he might have had a stroke when he was a kid. That's what the jury has to look at. Judge Brady was looking at the one issue. The one on the prejudice prong. Yes, ma'am. And I think it's huge on the prejudice prong. And I think that's where most of the cases end up. Most of the cases dealing with ineffective counsel usually end up looking at does it actually prejudice the defendant. Wessinger doesn't have to show that these abnormalities caused him to do anything. No, sir. He wants to show that to show that he may be less culpable than somebody who doesn't have all those problems. In Louisiana, anything can be mitigation evidence. And the jury didn't hear that. Yes. That's the problem here. The jury didn't hear that evidence that tends to maybe humanize him a little bit more. And maybe if they had heard that, maybe a single juror would have voted against the death penalty. But I don't think maybe is the standard that we're looking at it at. And in all of these cases, and I know Your Honor has seen plenty of them, whatever trial strategy the defense attorney uses at trial, a post-conviction attorney is going to come up here and say, well, they should have done something else because he got the death penalty. I misspoke. I should have said probability. Yes, sir. I know. But, again, you know, any time you try a death penalty case and you get a conviction and a sentence of death, the defense is going to turn around and say, well, if they'd have done this, if they'd have done that, if they'd have done that. If you read Strickland and the Supreme Court's cases, they don't say that the defendant has to show that there would have been a different result. Right. He has to show probability that the new evidence, the evidence that was left out below, arguably, would have undermined our confidence in that verdict. Yes, sir. Absolutely. But also under Strickland you have to show that it is the attorney's error, that the attorney's own conduct is what fell below the standard of care, and that that conduct by that attorney is what prejudiced him. And we're talking about Gillison, right? Yes, sir. Whether his conduct was. . . Yes, sir. Wasn't it pretty well below a reasonable counsel? He didn't have any of this humanizing evidence, did he? He just looked in a formulary and came up with some proof. That's what he testified to, Judge. But please go and look at the record and look at the petitions that he filed. He filed two separate petitions, and they raised numerous claims. They were not boilerplate language. They were not some formulary. They were specifically tailored to the facts of this case, and he made specific arguments related to this defendant. Now, when he recharacterized it in federal habeas, when he testified on the stand, he's like, oh, I just pulled it out of the hat kind of deal. But no, go and look at what he filed. He raised the issues. Judge Anderson in the State District Court ruled against him. That is the problem in this case on why it wasn't further developed. If the court wants to hear further development, it was not because Mr. Gillison failed to raise it. He raised the claim. He raised the claim adequately. We argued against it. I mean, the briefs in this case are extensive. I mean, I filed a hundred-page response to him. He filed a hundred-page application and like a 150-page second application. So, I mean, there was plenty of work that he did here, but the work failed because the judge ruled against him. And I've been way over my time. I want to reserve a couple of minutes for rebuttal if that's all right. Okay. Did you have any other questions before I go? Thank you, sir.  Ms. Hudson-Smith. Thank you, Your Honor. May I please the court? Judge Brady did not abuse his substantial discretion when he concluded that the claim filed in the 2010 capital habeas petition in this matter both related back to the original filing in 2004 and also presented materially that it presented evidence that materially altered the claim presented in state post-conviction by Mr. Gillison and therefore was defaulted, which gets us to Martinez. Now, with respect to the issue that Judge Owen raised about what does it take to materially alter a claim, I've read a lot of this court's decisions. It's clear that a claim can be materially altered in federal court from what was presented in state court and therefore not be exhausted and procedurally defaulted if the legal basis for the claim is materially changed, like you go from Fourth Amendment to Sixth Amendment claim or state law to federal constitutional law. We know that. But also, and the jurisprudence on this goes back for years, a claim can be materially altered if the facts in support of that claim are so substantially different than what was presented to the state court. It's a new claim, and the state court didn't have an opportunity to address that claim. That law was in existence before Penholster and Martinez, and in my mind, and I think this was actually in Judge Brady's mind, and I agree that he did not abuse his discretion in reaching this conclusion, when you look at the claim presented and the 2010 petition, it's an ineffective assistance of counsel claim. Mr. Gillison did raise an ineffective assistance of counsel claim in state court. As you noted, Judge Owen, that claim included trial counsel's failure to investigate a case in mitigation of death. In support of that, however, and I think, and from what I see in looking at the jurisprudence on this issue in this Supreme Court in the Vasquez v. Hillary case that we cited, this is very much a fact and case-based analysis. I mean, you can't just look to one case and say, oh, it's like that or it's not like that. You have to look at the petition that he filed and what he alleged, and essentially, in my analysis of that and Judge Brady's analysis, while Soren Gillison raised a number of issues based upon the record of the trial itself. That's all he had. He made that very clear in his evidentiary hearing testimony. The court found him credible, and it was uncontested, that Mr. Gillison, a first-year associate who was assigned this case without any help from anyone in his firm and who could get no help from the capital defense community, was on his own, took a disk, and created a claim of ineffective assistance and based it on what he saw, which raised red flags, by the way, in the state trial, and said, you know, he put on 17 witnesses. The lay witnesses were, you know, one or two pages at most. They do not appear to be prepared. He obviously didn't talk to the expert witnesses, so he didn't prepare them to testify. And the bottom line is there's no evidence that he did the ABA guidelines from PILA, Wiggins, et cetera, mitigation investigation himself or with the help of a mitigation specialist that is required and was required in 1997 when this trial occurred. And in support of that, he alleged... Mr. Gillison alleged really nothing that would support what counsel would have found had he done such an investigation. He says if he had conducted an adequate social history, he would have been aware of family history of health problems, specifically referring to Mr. Wessinger's seizures and his sister's seizures. And essentially, that's it. So that claim was denied, understandably, given what was before the court. The court denied it, saying he called 17 witnesses. He said, you know, maybe... prepare his expert witnesses to testify and call them in advance. What, are we going to tell them to lie, you know? And the court focused on that, denied. And then we get to federal court. And that same claim in that same form is filed by Mr. Gillison, again with no help, with no mitigation investigation, with no...other than a couple of phone calls to family, which is how he presumably learned about the seizures, no records, nothing more. He raises the same claim based upon the record. And as our experts and as this court knows, just as in trial court, in state post-conviction, just looking at the record is not enough, especially when there are red flags that say you should go further. Mr. Gillison, like Mr. Hecker, did not conduct a mitigation investigation, did not hire anybody to do a mitigation investigation. Mr. Gillison talked to the family. The judge found this. He found him to be credible. A couple of times over the phone. According to Troy Wessinger, who testified and was found credible, Mr. Hecker talked to the family for an hour in a group setting. That was his preparation for the penalty phase and asked Troy Wessinger, Mr. Todd Wessinger, my client's brother, to get a few witnesses there to court to testify as character witnesses. Both of these court-appointed counsel failed Mr. Wessinger and failed our system of justice. And as a result, once we got to federal habeas and we all got new attorneys got involved, including us, and we did that proper mitigation investigation, look at what that 2010 petition alleges. Yes, it does allege many of the same allegations set forth in Mr. Gillison's regarding failure to prepare the expert witnesses, failure to investigate, et cetera. But it goes in great detail about what would have been found had Mr. Gillison and trial counsel undertaken the investigation required by Strickland, Rompilla, Sears, Wiggins, the Sixth Amendment that was not undertaken at either level in the state court. And it is detailed. It's...with regard to that, what's new? That he was born into a family with significant history of seizure disorders, mental retardation, cerebral palsy, that the defendant suffered neurologic and psychiatric symptoms that impacted his ability to function in life,  that he was regularly humiliated by his father who singled him out for cruel treatment, that his mother and father came from generations of family... Mr. Wessinger, Todd Wessinger, and his brothers and sister Cynthia were the first in that generation on both paternal and maternal side to be off the plantation, where they lived essentially not much different as plantation workers than in slavery days. None of that. We've alleged all of that. We talk about Miss Wessinger's two fetal deaths and her high blood pressure. We allege Mr. Wessinger, Todd Wessinger's convulsions as a child, and with specific reference to his inability to walk. There was evidence of seizures that he had, seizures as a child, in the state court. Yes. So there you have it. That's all he alleged. Based upon a conversation with the family, he says, I think he had... And that was maybe not the only time he'd been hit in the head, that he had seizures, his family had high blood pressure, health issues, that he'd lost a child. And was bereaved by that, and that he was bereaved by his father's death, and he lived in a dangerous community. Those were the allegations. What we've alleged goes far beyond. I can assure you, if we had put this pre-Martinez... You know, look at the jurisprudence. This is material alteration, in addition to everything I've mentioned so far. He never... Todd Wessinger never lived independently. Horace Wessinger, his father, was a violent alcoholic who hit and threatened his wife routinely and assaulted her in front of the children. A family history of neurologic and psychiatric impairments, a family history of alcoholism. Todd Wessinger's difficulties in his ability to even function as an adult independently, his inability to do anything more than low-paying jobs, neurological testing, which was never done anywhere. There was a psychologist and psychiatrist who briefly assessed Mr Wessinger, but there was no neurological testing, which evidenced a brain impairment. And again, as Judge Dennis says, we don't have to prove that that brain impairment quote, caused the crime. What we're doing is assessing that the jury should have the information it needs if the mitigation investigation required by the Sixth Amendment had been done, an assessment, an accurate assessment, of Mr Wessinger's moral culpability with respect to this crime. And as Dr Woods testified, again uncontested, at the evidentiary hearing, the brain impairment, the hole in the head that the MRI shows, uncontroverted, and could have shown, by the way, in 1997, Dr Woods explained that this is a basic Brownie camera MRI that was available since 1963 that could have been available to Mr Hecker and Mr Gislason to establish, and neurological testing, of course, was available in 1997 and in 2001 when Mr Gislason was working on this case, could have established this brain impairment that is in his frontal lobe and affects his decision-making and his judgment and finally explains why he was the black sheep of this family, why he couldn't learn that, you know, going back with his alcoholic father was only going to cause him more misery, why he couldn't adjust his conduct, even from a child on up, to meet the demands of his father and his family, and why he ended up with low-paying jobs, some criminality here or there, nothing like this ever in his life. And all of that, none of that, was even hinted at in the state post-conviction petition. How can you say that this court has adjudicated, that the state court, rather, adjudicated the claim that is the 2010 11C claim that Judge Brady addressed on the merits once he found that Martinez applied? And again, I can... If the claim had been adjudicated, yes, Penn Holster would have applied. It wasn't. It was a wholly different claim because of the incredible additional evidence of neurologic brain damage. I mean, Mr Gislason never even suggested beyond a childhood seizure that Todd Wessinger had any mental health problems. Not even close. You know, I think if we were just arguing... If I were just up here trying to argue that that was just a supplementation of what Mr Sorenson did, you would... Gislason did, you would be laughing me out of the courtroom. So it is the case that this established jurisprudence that supports that Judge Brady was not wrong, he did not abuse his discretion when he found that this claim, balancing the facts and the case and looking at the two petitions, all those things that must be done, and it's a continuum. And as Camilla, State Post-Conviction Counsel, the equivalent of Soren Gislason, State Post-Conviction Counsel hired a mitigation specialist, put on evidence that wasn't put on at trial in State Post-Conviction, that this, you know, the horrible, horrible childhood that this defendant had, none of that had been presented before. He presented it, his father's abuse, etc. In federal court, he says, wait, here's another couple of affidavits that support that the father abused him. And that he had a horrible childhood. And the court said, we're not considering that under Penholster. This claim is the same claim, it was decided in state court, you brought it here, we're not looking at that. We've gone way beyond supplementing here. This is a new claim that's materially altered because of the incredible amount of facts that a true mitigation investigation presented and established, by the way, ultimately, the prejudice. That is the other big battle we always have in these strickling claims. And I might add that this claim, the fact that the claim was materially, the State Post-Conviction claim was materially altered by the 2010 facts and allegations with regard to this mitigation case and what wasn't done, that's not the same standard as Relation Back. 15C, Mailey, if I'm pronouncing it correctly, Supreme Court case, Relation Back says, is there a common core of facts here that would allow for a Relation Back? And admittedly, an amendment that alleges ineffectiveness doesn't automatically relate back if you alleged ineffectiveness before. I think in Mailey, the defendant had alleged ineffectiveness, had alleged a claim with regard to... It was something at trial, I forget the exact claim. And then he sought to amend to allege that his confession was unconstitutionally gotten. And the court said that was the pretrial. That was a different common core of facts, a different stage of the proceeding. This is trial. Well, that 2004 petition, followed by Mr Gislason that mirrored his State petition, that was ineffectiveness. That was at the penalty phase. That was Mr Hecker. That was a failure to do all those things. That's a different standard. There's nothing inconsistent with these two standards. And so Judge Brady did not abuse his discretion when he allowed for the Relation Back so that this 2010 claim, which is never presented to the state court, was timely filed. It was defaulted. But, you know, before the case was over, Martinez was handed down. And incredibly, we had in the petition tons of evidence of Mr Soren Gislason's inadequacies. And so it was like a textbook case of Martinez's ineffectiveness of state post-conviction counsel. And with respect to the question of what were Mr Gislason's inadequacies that Judge Owen asked about, the district court, Judge Brady, of course, he was there. Mr Gislason testified at least half a day. Judge Brady found him to be credible, and he concluded he didn't do a mitigation investigation, he didn't know how to do a mitigation investigation, he had no help, yes, he had no money, and he didn't have time, but he was ineffective because he did not do what needed to be done because he didn't even know what to do. He was a first-year associate. You know, Judge... You say he didn't know what to do. Didn't he file motions asking for, repeatedly, more than once, discovery, et cetera, et cetera? What did those motions say? What was he seeking discovery for? Well, what he was asking for was funding, because when he went, and he details this at length in his testimony, when he went to the LIDAB, which was the Louisiana Public Defender Board, or he went to the Capital Assistance Project, or he went to the Louisiana Post-Conviction . . . Everybody he went to said, get out of here, you know, we don't have time to deal with you. He was there because Judge Berrigan had gone to his boss, Russ Herman, and said, we need pro bono counsel. And so he got the job. I think it was Judge Barbier and Judge Berrigan, according to the testimony, and he had clerked for Judge Barbier. So Mr. Herman, who was busy doing a big tobacco plaintiff's case, said, here, it's yours. And, oh, by the way, according to Mr. Gissless, and he said, you still have to be productive, you still have to do everything we expect of you as a first-year associate. And so he did the best he could. I'm not saying Mr. Gissless is stupid. Various motions. He said, I need funding for what? For expert assistance for a mitigation investigation. And so he did know to do that? He did. And he was given, again, he was given forms to fill out. He filed not just fill-in-the-blank forms, did he? Well, he got affidavits from people in the community to say what all was needed. What did they say was needed? They said, what I'm saying, that in a state post-conviction, that in a state capital case, whether it's a trial or a post-conviction, you've got to do a full mitigation investigation. So he knew he needed to do that? He knew he needed to do that. Judge Brady's finding that he didn't know he needed to do that is belied, if you want to use that word, by the motions he actually filed in state habeas. He didn't know how to do it. But he asked for money to get a mitigation. He did. He knew to do that. He asked. Be specific. What did he ask the money for? He asked for money for a mitigation investigation. He specifically asked for it. And I believe, and I have the pleadings here, but I believe he also at one point asked for expert assistance. But nothing was specified. Please keep in mind that, you know, Denise LaBeouf. What did the affidavits that he filed with that say? They said there were long affidavits from Denise LaBeouf and other people in the capital defense community in Louisiana saying this is what you need to do, you know, you've got to do this investigation, et cetera. But he tried to do that, and the reason he couldn't do it was because the state court said no funding. No, the reason he couldn't, well, that didn't help. But you know what? He should have gotten his car and drove to Baton Rouge and done the investigation himself. You don't say, oh, I can't get a neurologist. He couldn't do an MRI. No, but you know what he could do? He could go do the investigation that shows all the things that he didn't allege that we have since alleged based on the family history, background, records, et cetera, to say we've got a problem here. We've got a family history of cardiovascular disease, a mental retardation, a cerebral palsy. Nobody has alleged to my knowledge that the state courts violated constitutional rights because they did not fund the request. No, that's not an issue. That really the issue? Had he gotten the funding, it's likely he would have uncovered all that you've uncovered. According to Mr. Gislason, he would not know what to do with the funding if he had it. He felt that unschooled. But certainly if he had the funding, that would have been a step in the right direction. But without the funding, he gets in the car, he goes to Baton Rouge, and he starts knocking on doors. That's what he does. He's not forgiven that obligation because he can't get a mitigation specialist or expert. He's still obliged to do that. What pieces of evidence do you say he would have uncovered had he knocked on doors that materially changed what he'd already presented? A lot. He would have discovered, for instance, that Linda Wessingers, who lived on the plantation in Germania until she was 11, that her brother has three daughters who live in a house trailer near Germania who are mentally retarded and on disability. He's not mentally retarded. No, he's not. Why is that even admissible? But read Dr. Wood's testimony. Read Mr. Stettler's testimony. Read Michelle Forney's testimony, all of which the court found credible. With respect to the need to get records to establish, if he had gotten that information, he could have gone back to the district court and said, I know I was just doing boilerplate stuff before saying, oh, you've got to do it, you've got to do it, but here's the reason, Judge. I found out that these three women are mentally retarded, and I found out that Cynthia doesn't just have cerebral palsy and seizures. She's mentally retarded, his sister. I found out that his mother's had two fetal deaths. His father has had heart disease. He's had uncles who would. . . Out of all that you're listing, why would that be relevant to this person who had a 99 IQ or something? Well, we're talking about he had a 90 IQ, I believe, or 91. This is how it's relevant. I mean, when you go to a doctor, the doctor wants to know your family history. Most of us have parents with heart problems. And this goes. . . I don't think most of us have three cousins at least with mental retardation. He asked for funding for mental health experts, didn't he? I believe he did. But without any allegations. . . You know, he has not suggested anything. He did not suggest a single thing in support of that specific to this case. He just said, everybody tells me this is what I've got to do, here it is. It was almost like a trained dog. I mean, he did not know. And then to add insult to injury, once he filed his 2001 petition, he assumed that he was off the case. And for a year and a half when he could have been gathering additional information, he did nothing on the case. He didn't even go to see his client. Now, that is ineffectiveness. And that is, as Mr. Gislason, to his credit, in the hearing in front of Judge Brady, acknowledged and admitted this was all on him. He's not blaming just Judge Anderson for not giving him more time. He effectively got more time. He just didn't use it. And he's not even blaming with regard to the failure to appoint experts or mitigation assistants. Again, he didn't go out there and do his due diligence to bring back to Judge Anderson specific issues that were relevant to this particular case. You do your mitigation investigation. It shows all these red flags. I've had experts. I've said, will you look at this and write me an affidavit in support that I need to hire you? Why do I need to hire you? He did none of that. And as he said, quite honestly and sincerely, he said, I didn't know how to begin asking for what I needed. I didn't know where to start. I was lost. You know, I'm not quoting him exactly. But if you look at Mr. Gislason's testimony, it is powerful. And his acknowledgment, and he's still at his law firm, you know, he said he was a partner at the Herman, Herman, whatever, Katz Law Firm. Herman, Herman, Herman and Katz. I knew it was something like that, that he's a partner there. And he said, I had no help from the firm. I had no help from anybody in the capital defense community other than these sort of standard affidavits and all. I mean, those affidavits in support didn't say, Mr. Wessinger needs this because of X, Y, and Z. There was nothing there. There was no investigation done, not even by Mr. Gislason, who was simply not, it was not under the Sixth Amendment, under Strickland, under all of those cases that you all know so well. It was not okay for him to say, well, I followed the affidavit from the community. I didn't get the experts I needed. I'm through. Assuming we were to agree with you that this is a new claim and it's unexhausted, why shouldn't we send it back to state court? I mean, what's your best case on federal courts can just go ahead and proceed without either staying or dismissing to allow exhaustion? Because the state court, it's a successive petition. The state court may or may not act on it. Why shouldn't the federal courts stay and remand to allow the state court to pass on it in the first instance? What's your best case? Well, they never have acted on it. Federal courts don't have to do that. It's just like every case I read seemed to come from Texas. If it's unexhausted, we usually stay and allow it to be exhausted, don't we? Not in Louisiana. Well, the federal courts. I'm talking about the federal courts. Not in Louisiana in federal court. I've never done that, and I've done a lot of capital cases. Federal courts are federal courts. This is the Fifth Circuit. We cover Texas and Louisiana. I'm just saying I think the practice may be different. I don't care about the practice. What is the law? We've got Trevino. Isn't that what happened in Trevino? Yes, that was a Texas case. What's your best case that says federal courts don't have to worry about exhaustion? We can just assume that if we remanded, the state court would do nothing. What's your best case that we can do that without remanding? A federal court can read the state law as well as any state court. Tell me your best case in this situation. Best case, and there's cases that have said this is exhausted because you do not have a vehicle for taking it back to state court because the state law, which is an adequate and independent ground for this procedural default, says under 930.4 you cannot bring the state court decided on the merits. We do not have a ruling. If this is a, quote, new claim, we don't have a state court ruling on the new claim. We don't know if they would procedurally default it. We don't know if they decided on the merits. Now, why shouldn't we give the state court a chance, if we agree with you, to say? Why should they have to say when their law is clear? We don't know what they would do. They might say in light of Trevino and Martinez and that it's a new claim. We don't know what they may say. Well, that certainly hasn't happened in Texas, and I have no reason to believe that. Well, maybe. I read a bunch of cases, but in any case, I know I have to sit down, but I think that we have to assume that the Louisiana court would follow Louisiana law. Write us a letter saying what federal law cases say. We don't have to allow the state courts a chance to exhaust. If there are cases the other way, we need to know those, too. But besides, in a one-page letter, give us your best authority. Assuming we get to that point, do we have to stay and allow exhaustion in state court? I'll do that, Your Honor. Thank you. Ms. Husserl, I seem to remember he was either a strike force lawyer or an assistant U.S. attorney named Giselson. Is this person related? I think so. Mr. Soren Giselson's father, who died, was a – I can't remember his first name, but that may be who you're referring to. His name is Giselson, and he was an attorney, and he had his own firm. He wasn't in the Herman firm. Was he a strike force or an assistant U.S. attorney before? He had been at one point. The way I met him was he volunteered during this period where there were no attorneys to do a capital habeas case that came into the Western District of Lafayette, and I met him then. And then soon after that, he died of cancer. Okay. Thank you. Thank you, Ms. Husserl. Thank you, Your Honor. Mr. Lee, you have eight minutes. Joe, and I'll try to answer your question first because it's freshest in my mind. If you were to order a remand to the state court for them to consider it, there are two hurdles that a defendant would have in state court. 930.4 deals with repetitive applications. I don't care about the state. Tell me what do we have to do. Tell me that we must presume what the state court will do, or I just need to know what we're supposed to do. Not what the state court is likely to do. Right, right. What are we required to do? In answer to that, I have seen this court do both. I have seen this court remand it to state court for consideration, as counsel said. In a couple of cases I've seen where particularly Texas courts have said it's an abuse of the writ and kick it right back. I've seen other cases where the Texas courts have considered it. I don't know what a Louisiana court would do because I haven't actually seen it when it's been sent back. What the federal rule is on that, I don't know. But, again, I think you have to consider in this case, though, the interplay between the Cullen problem with the new evidence to support an old claim and whether or not this is a new claim. Ms. Hudsmith. I'm just saying, assuming you lose, lose, lose, what are you supposed to do? You don't have to answer. You don't know, but I'm just saying when you get back to your office, look at the law, send us a short letter. I'm not sure we're going to find a whole lot, but I'd be willing to send you a letter. I'd be willing to research anything. Yes, ma'am. No problem. Again, Strickland, just going back to Strickland and talking about ineffectiveness, Strickland has a lot of warnings in there about hindsight and second guessing. And, of course, like I said earlier, any time you have one of these cases, you can always second guess. Once you try something and it loses, it's always easy to go back and say, oh, well, we should have done more. We should have done something else. Obviously what we did wasn't good enough. And I think a lot of what's going on here is second guessing. What did Mr. Gieselson do? I mean, ultimately everything on if you get to the Martinez question, everything's going to turn on whether or not he was ineffective. What did he do? His testimony is that he wasn't sure. He went and contacted every capital litigator that he could think of, including LIDAB, including various alphabet soup agencies that represent different capital defendants, and he asked them, what types of things do I need to do? What's the first thing you do when you bring a claim? Any first-year lawyer knows this. You file a pleading. He filed a pleading in this case. He filed the post-conviction. It was a very thorough post-conviction. It was not boilerplate. It was not something you can find on the Internet. It was directly related to this defendant and what happened at the trial. Yes, he had to use the trial court record because that's where he's going to gain his facts and whatnot. So he filed the pleading. The judge summarily dismissed the pleading. The judge denied the motions requesting funds. What more could Mr. Gieselson do at that time? I dare say that if it had been the attorneys that testified in federal court, Mr. Clement's been before Judge Anderson before and has had similar rulings. So in all his expertise and in all the matters that he got, he still can't overcome a trial judge that rules against you and summarily dismisses your case. That's the bottom line. You file the pleading. The judge rules against you. How is that in effectiveness of counsel? That's not in effectiveness of counsel. That's, you know, you didn't prove well enough to the judge that you should get a hearing. The judge might have made specific findings that this person was inexperienced and didn't know what to do. Your argument to counter that to us is, well, he knew enough to go and ask for funding, and had he gotten the experts, all of this would have been uncovered. What findings, if any, did Judge Brady make regarding that argument? I don't think he got that far because, again, he was ruling on what was before him. Was that argument before him? Yes, ma'am. I think even, I believe it was in our briefs. I believe that was part of our argument in our pre-hearing briefs, and I don't know if we filed post-hearing briefs, but that was part of the presentation of the claim is whether or not Mr. Gieselson was, in fact, ineffective. And in Mr. Gieselson's testimony, he repeatedly says, I sought help, I sought advice, I sought this, and I filed my pleading. I sought funding. It was denied. I sought more time. It was denied. So Judge Brady's finding that it was Mr. Gieselson's fault, I think it flies in the face of the record. It falls in the face of what happened in the state court proceeding. But Judge Brady didn't look at the state court proceeding. Judge Brady focused primarily on the, quote, de novo evidence that was before him in federal district court. So he didn't talk about what Mr. Gieselson did. He talked about what Mr. Gieselson testified to in court. I'm sorry, Your Honor. So Gieselson didn't testify that he was ineffective. Oh, yeah. He said he was, but it was because he didn't have enough time and money. If you look at it, it's all, if he truly thought he was ineffective, he should have reported himself to the Bar Association. I mean, if this court finds that he's ineffective, you're saying that he was acting as if the guy had no attorney at all. That isn't, you know, under Strickland. That's a pretty heavy finding. So if you're going to throw yourself on the sword and say, oh, I was totally ineffective and I totally screwed the pooch on this one, then you got to, I think you have some consequences there. Didn't he, in effect, abandon this client? Again, that was the testimony, Your Honor, but if you looked at what happened in state court, he continued to work on the case and he filed a second application before Judge Brady ruled in this case, I mean before Judge Anderson, the state court judge, ruled on this. So there was testimony. I mean, I don't know what he was doing behind the scenes when I wasn't seeing him, but I know he was talking. I thought he just filed a motion to withdraw and he didn't do anything. Well, he filed, and again, we didn't know of that. We're dealing with the case in the district court. I don't know what he filed in the Supreme Court until he testified to it. All I know was in the state district court, he was still in contact. He was talking to me. He was filing stuff. He was asking me to give him more time. We had all kinds of conversations about, you know, can you give me more time to do this? Can you give me more time to do this? I told him, Soren, I'll give you all the time in the world if you would just file a finished petition so we can get a ruling on it. I mean that's what we told him from the beginning. That's what I've told every capital case that we've been involved in. If you will try to go forward and bring a claim rather than filing a shell petition and trying to sit on it for six years, if you will file a claim, I will give you all the time in the world because I need time to respond. I need time to read the record. So I've never jammed anybody on time. But he filed his pleading in this case and he went in assuming that Judge Anderson was going to give him more time, that Judge Anderson was going to have discovery, that Judge Anderson was then going to allow him to have a hearing two or three years from now. But that didn't happen. It was summarily dismissed. That's what he didn't expect. But Mr. Gieselson worked on this case throughout. He testified. He contacted other people. He's a sharp guy. You know, this is not no dummy. He's a sharp guy who to this day continues to represent Todd Wessinger in federal district court on the lethal injection lawsuit. So he stayed with this case all along. He filed the initial federal habeas petition in this case and he worked with counsel throughout. So did he say he was ineffective on the stand? He said he was ineffective, but he always qualified it by I didn't have time or money. I was ineffective because I didn't get the stuff. Yes, ma'am. But he didn't say it that way. You know, he said I didn't have the time and money that I needed. I needed more time and more money. But he did everything he could in the two or three years that he was representing Todd Wessinger in state court to educate himself on how he needed to proceed the claim. And he filed a petition, a very large petition in court, and got the claim to the judge. What he didn't expect, though, was a summary dismissal. And that's what happened. He still represents him. I think he's still on record. In fact, I'm kind of shocked he wasn't here today. In regard to all the family evidence about Todd Wessinger and his family living on or near a plantation, Todd Wessinger was born and raised in Baton Rouge and Mayfair subdivision. Did he ask for neurological examination in state court? I don't know that he specifically asked for it. I know that he asked for more mental health evaluation and anything related to low intellectual functioning, which is what they hung this on in federal court is that this was all, Dr. Wood was all going to prove low intellectual functioning. And at trial, Todd Wessinger had a psychiatrist and a psychologist. So they could have explored that then. Why they didn't, I don't know. But he had the tools that he needed at trial. So Judge Anderson, when he reviewed it, said, I'm not giving you this to relitigate the entire case, basically, which was essentially what Mr. Gieselson was asking to do. So the judge denied it. That's the judge's denial. And last thing in relation to the 2010 amendment, if the 2010 amendment is the first time that this is brought to the federal court, then I still stand by you can't get around the one-year time limitation. Although Mayo says it has to be the same core facts or whatever, counsel admitted these are all new facts. This is all a new claim based on new facts is what she's saying now. Well, if it's a new claim based on new facts, it can't survive under Mayo and Rule 15 and get around the federal one-year time limitation, because what was filed in 2010 was untimely. This court had previously ruled and given Todd Wessinger equitable tolling. The judge said he had until October of 2005, I think, or 2000—no, I'm sorry, October of 2004 to file any claim or amended claim that he wanted to. After October of 2004, it was untimely. Thank you, Mr. Lee. Thank you, Your Honors. That concludes the argument in this case, which the court will take under its own.